United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH PEARSON,<br>Plaintiff,<br>v.<br>SSA COMMISSIONER, et al.,<br>Defendants. | Case No. 25-cv-03754-ASK<br><br>**ORDER RESOLVING SOCIAL SECURITY APPEAL**<br><br>Re: Dkt. Nos. 18, 19 |

Plaintiff Joseph Pearson seeks judicial review of a final decision by the Commissioner of the Social Security Administration ("S.S.A.") denying his claim for Social Security benefits under Title XVI of the Social Security Act. Plaintiff and Commissioner filed briefs, and Plaintiff filed a Reply. Dkts. 18, 19, 20. Pursuant to Civil Local Rule 16-5, the matter is submitted without oral argument. Plaintiff has moved for reversal of the Commissioner's final decision, and remand of this case in accordance with sentence four of 42 U.S.C. § 405(g). Defendant has moved for affirmation of the Commissioner's final decision.

## I. BACKGROUND

### A. Factual Background

Plaintiff is a 42-year-old resident of Oakland, California who has been homeless since approximately 2017. Administrative Record ("A.R.") at 52, 395.[1] In January 2017, a wooden object became lodged in Plaintiff's left eye during a fall, resulting in the loss of that eye. *Id.* at 1566, 1556. In January 2018, Plaintiff was hit by a train and subsequently admitted to intensive care, where he was intubated, placed on life support, and treated for an apical pneumothorax, a splenic laceration, a left kidney injury with a subcapsular hematoma, fractures of all but one of his

[1] The Administrative Record may be found in the various exhibits associated with docket entry 15.

ribs, multiple spinal fractures, and a scapular fracture. *Id.* at 1427–30. After three weeks in the hospital and multiple operations, Plaintiff was deemed "stable" and discharged. *Id.* Within days, however, he returned to the hospital with shortness of breath and severe pain in his chest, back, and abdomen. *Id.* at 1639, 1649. He was found to have leukocytosis, thrombocytosis, and a 15-centimeter by 15-centimeter buildup of fluid caused by a perisplenic abscess and/or an infected hematoma. *Id.* at 1639. Plaintiff had a drain placed near his spleen and was subsequently operated on again to aid drainage. *Id.* at 1653–55. He was discharged nearly four weeks after his readmission. *Id.* Once his prescribed post-discharge medication ran out, Plaintiff used heroin and/or fentanyl daily to manage his pain.[2] *Id.* at 391–98.

Since at least July 2018, Plaintiff has received primary care at LifeLong Trust Health Center ("Lifelong Trust Clinic"). *See id.* at 391–98; Dkt. 18 at 10. In July 2018, he was assessed there by Nurse Practitioner Kevin Lagor for chronic pain syndrome, opioid use disorder, and an abscess on his right forearm caused by intravenous heroin use. A.R. at 391–98. On December 20, 2018, he again visited LifeLong Trust Clinic and was seen by Dr. Jason Reinking, M.D., who noted symptoms of back, joint, and neck pain and assessed him for chronic pain syndrome, opioid use disorder, mental health disorder, traumatic enucleation of his left eye, and acquired hunchback. *Id.* at 1922–25. Dr. Reinking prescribed suboxone and noted "significant curvature of cervical spine in need of imaging." *Id.* at 1924. In notes from a December 31, 2018, follow-up appointment, Dr. Reinking indicated that he was awaiting C.T. scans of Plaintiff's spine. *Id.* at 1918–20.

Plaintiff was admitted to the hospital in June 2019 for abdominal pain. *Id.* at 460–62. Responding to concern "for gastric volvulus through the diaphragmatic hernia," doctors operated to reduce the diaphragmatic hernia contents, to repair the diaphragmatic defect, and to gastropexy the stomach via gastrostomy. *Id.* Plaintiff was discharged after eight days. *Id.*

Plaintiff visited LifeLong Trust Clinic again in October 2021, complaining of hernia pain. *Id.* at 1883–87. He was seen by Dr. Reinking, who noted that Plaintiff "[w]ants to get off streets"

---

[2] Records from an October 2021 primary care visit note "original heroin use, then fentanyl use after trauma 2018 due to pain." A.R. at 1884.

and "[h]as [five] problems": housing, fentanyl use, chronic pain, shortness of breath, and depression. *Id.* at 1886. Dr. Reinking also indicated a primary diagnosis of chronic pain syndrome, as well as severe and chronic fentanyl use disorder, chronic hepatitis C, a history of opiate overdose, a history of diaphragmatic hernia, and recurrent shortness of breath. *Id.* at 1884–85. Dr. Reinking ordered an abdominal CT scan that was never performed. *Id.* at 1885; Dkt. 18 at 10. He also conducted a physical examination and noted that Plaintiff was "moving all extremities" and had a "normal gait." A.R. at 1887.

In January 2024, Dr. Reinking authored a medical opinion with respect to Plaintiff's ability to do work-related activities. *Id.* at 1962–64. In it, he indicated a near inability for Plaintiff to lift and carry things; limitations of Plaintiff's ability to stand and walk, as well as to sit, to less than two hours per eight-hour workday; a limitation of ten minutes sitting before needing to change position; a limitation of ten minutes standing before needing to change position; a need to walk around every ten minutes; a need to shift from sitting to standing or walking at will; and a need to lie down at unpredictable intervals during work shifts. *Id.* at 1962. In the section asking what medical findings support such limitations, Dr. Reinking wrote: "Severe physical trauma as hit by train 2018 with persistent chronic severe debilitating pain due to mix of lumbar fractures with resultant severe scoliosis, [history] of multiple rib fractures, history of clavicle fracture, and known hernia (diaphragmatic)." *Id.* at 1963. Dr. Reinking indicated further that Plaintiff could "[n]ever" stoop, kneel, crouch, crawl, or climb stairs, and that his impairments affected all listed manipulative activities, including reaching and feeling. *Id.* With respect to environmental restrictions, Dr. Reinking indicated "avoid all exposure" with respect to extreme cold, extreme heat, wetness, humidity, and hazards such as machinery, noting that such limitations were explained by "chronic pain . . . as well as blindness in left eye." *Id.* Dr. Reinking indicated that Plaintiff's impairments would regularly cause him to be absent from work and that they would interfere with his concentration half of the workday, the highest option provided on the form. *Id.* at 1964.

**B. Procedural Background**

On September 20, 2021, Plaintiff filed a claim for disability benefits, alleging that his

United States District Court
Northern District of California

inability to function began as of August 31, 2014. *Id.* at 53. He claimed disability due to "Depression; Back/Shoulder/Stomach Pain After Being Hit by Train; Chronic Fatigue; Chronic Shortness of Breath." *Id.*

The S.S.A. denied his initial claim in April 2022, noting that "[c]urrent evidence in the file is insufficient" and that Plaintiff had not responded to calls or letters requesting more information. *Id.* at 52–63. His claim was denied again on reconsideration in September 2022. *Id.* at 65–76.

A hearing was held before an Administrative Law Judge ("A.L.J.") on October 19, 2023. *Id.* at 41. Plaintiff was absent for this initial hearing but was represented by counsel, who attributed Plaintiff's absence to a miscommunication and stated that Plaintiff had not waived his right to appear. *Id.* at 44. Plaintiff's counsel also noted that Plaintiff did not have an I.D. and, accordingly, would not be able to enter the courthouse even if he were present. *Id.* The A.L.J. then stated he would schedule a supplementary hearing to accommodate Plaintiff's appearance and to give him time to obtain valid identification but that if Plaintiff failed to appear again no additional hearing would be scheduled. *Id.* at 45. The A.L.J. proceeded with the October 2023 hearing and heard testimony from an impartial vocational expert. *Id.*

Plaintiff was absent again for the supplementary hearing, which was held on January 25, 2024. *Id.* at 31. Plaintiff's counsel was present and stated that he was unable to locate Plaintiff and had not been in contact with Plaintiff for at least three weeks. *Id.* Citing this loss of contact, the A.L.J. found that Plaintiff had constructively waived his right to appear. *Id.* at 32. The A.L.J. advised Plaintiff's counsel that he would send Plaintiff a Notice to Show Cause, and then moved ahead with the hearing, including taking testimony from an impartial vocational expert.[3] *Id.* at 32, 17.

On April 3, 2024, the A.L.J. denied Plaintiff's application for supplemental security income, finding that Plaintiff was not disabled at the time Plaintiff filed his application. *Id.* at 17–24. Specifically, the A.L.J. concluded that although Plaintiff had "severe impairments" that

[3] While the hearing transcript indicates that the A.L.J. stated that he would order a Notice to Show Cause, Plaintiff suggests that this might have been a transcription error. Dkt. 18 at 9. Defendant does not dispute this suggestion. The Administrative Record does not contain a Notice to Show Cause.

"significantly limit [his] ability to perform basic work activities," Plaintiff still possessed the "residual functional capacity to perform [limited types of] light work" and make "simple work-related decisions," and therefore was suitable for occupations that "exist[] in significant numbers in the national economy." *Id.* at 24. Notably, in making this determination, the A.L.J. found Dr. Reinking's January 2024 medical opinion "not persuasive." *Id.* at 23. In rejecting this medical opinion, the A.L.J. reasoned that Dr. Reinking's assessment of Plaintiff's condition was "not supported" by Plaintiff's "lack of [recent] treatment and medications" and "inconsistent" with Dr. Reinking's most recent examination of Plaintiff, which occurred in 2021. *Id.* at 23.

Plaintiff then requested review by the Appeals Council, which, after consideration, affirmed the A.L.J.'s decision on February 24, 2025. *Id.* at 1–6.

Plaintiff timely filed this action on April 30, 2025, seeking review of the decision of the Commissioner pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. § 405(g) and 28 U.S.C.A. § 1351). *See generally* Dkt. 18.

## II. LEGAL STANDARD

A federal court's review of Social Security determinations is limited. *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015); *see also* 42 U.S.C. § 405(g). Federal courts "leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." *Brown-Hunter*, 806 F.3d at 492 (internal quotation marks and citation omitted). The Commissioner's findings may be reversed if they are "based on legal error or are not supported by substantial evidence." *McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir. 2002) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and must be more than a mere scintilla, but may be less than a preponderance." *Rounds v. Comm'r of Soc. Sec. Admin.*, 807 F.3d 996, 1002 (9th Cir. 2015) (internal quotation marks and citation omitted). Under the standard, "a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102–103 (2019) (internal quotation marks and citation omitted). The Court "must consider the evidence as a whole, weighing both the

evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Rounds*, 807 F.3d at 1002 (internal quotation marks and citation omitted). Where the evidence is susceptible to more than one rational interpretation, the Court must uphold the A.L.J.'s findings if supported by inferences reasonably drawn from the record. *Id.* Even if the A.L.J. commits legal error, the A.L.J.'s decision will be upheld if the error is harmless. *Brown-Hunter*, 806 F.3d at 492.

## III. DISCUSSION

### A. Whether the A.L.J.'s Due Process Finding Constituted Legal Error

At the January 2024 hearing, the A.L.J. found that Plaintiff constructively waived his right to appear at such hearing. A.R. at 17, 32. Plaintiff argues that the A.L.J. erred in so finding. Dkt. 18 at 4–6. The government contends that the A.L.J. followed all relevant procedures and that, in any event, substantial evidence supports the A.L.J.'s findings. Dkt. 19 at 1–3. The Court reviews for legal error. *See McCartey*, 298 F.3d at 1075.

Applicants for social security benefits are entitled to due process in the determination of their claims. *Holohan v. Massanari*, 246 F.3d 1195, 1209 (9th Cir. 2001) (citation omitted). Due process requires that disability benefit claimants receive "meaningful notice and an opportunity to be heard before [their] claim for disability benefits may be denied." *Udd v. Massanari*, 245 F.3d 1096, 1099 (9th Cir. 2001) (citation omitted). Consistent with these principles, S.S.A. regulations provide that a claimant has a right to appear before an A.L.J., present evidence, and state their position. 20 C.F.R. §§ 404.950(a), 416.1450(a).

Where, as here, a representative appears for an absent claimant, S.S.A. regulations permit an A.L.J. to find constructive waiver of the right to appear where (1) the representative is unable to locate the claimant; (2) the Notice of Hearing was mailed to the claimant's last known address; and (3) the agency has followed certain contact procedures. HALLEX HA 01240.025(D)(2). Upon making such a finding, the A.L.J. may do one of two things: first, cease the hearing and issue a decision on the record; or, second, proceed with the hearing, accept witness testimony, and allow the claimant's representative to argue on the claimant's behalf. HALLEX HA 01240.025(D)(2)(a). While HALLEX is an internal agency manual without binding legal effect, Ninth Circuit courts find it persuasive as to whether an A.L.J. has correctly found constructive waiver. *See Clark v.*

*Astrue*, 529 F.3d 1211, 1216 (9th Cir. 2008) ("[A]s an Agency manual, HALLEX is entitled to respect . . . to the extent that it has the power to persuade." (internal quotation marks and citations omitted)); *J.M. v. Bisignano*, No. 25-CV-00600-SVK, 2026 WL 1603793, at *3 (N.D. Cal. June 4, 2026) (citations omitted) (noting that "this Court finds [HALLEX] persuasive").

Plaintiff contends that at the January 2024 hearing the A.L.J. erred in finding that Plaintiff constructively waived his right to testify. Dkt. 18 at 4–6. But the HALLEX criteria for finding such waiver appear to have been satisfied as of that hearing. The record establishes that Plaintiff's counsel was unable to locate Plaintiff, A.R. at 31–32; that a Notice of Hearing was sent to his last known address, *id.* at 157; and that the S.S.A. sent a reminder notice, *id.* at 181. Consistent with HALLEX, the A.L.J. proceeded with the hearing and took testimony from the vocational expert. *Id.* at 32–40; *see* HALLEX HA 01240.025(D)(2)(a).

Plaintiff contends that even if the A.L.J. complied with HALLEX guidance, "procedural due process concerns supersede that guidance given [P]laintiff's circumstances." Dkt. 18 at 6 (citation omitted). According to Plaintiff, "given the possibility that [he] would ultimately be located, he was entitled to an opportunity to be heard." *Id.*

The Court appreciates that strict compliance with HALLEX's notice requirements may count for little of practical value where, as here, the claimant is homeless. Yet the A.L.J. did everything he reasonably could to give Plaintiff the chance to testify. At the October 2023 hearing, the A.L.J. asked Plaintiff's counsel about his client's "I.D. situation," urged him to get in touch with his client, and scheduled a supplemental hearing despite not being required to do so by HALLEX. A.R. at 44–45. Additionally, at the January 2024 hearing, before making his finding of constructive waiver, the A.L.J. asked multiple questions of Plaintiff's counsel with respect to Plaintiff's whereabouts and communication habits, learning from counsel that he had "lost contact with [Plaintiff] a month ago or maybe three weeks ago." *Id.* at 31–32. Only after Plaintiff failed to appear at two separate hearings did the A.L.J. find constructive waiver, and even then Plaintiff was represented by counsel at both hearings. An "opportunity to be heard," the legal term of art, does not require that an opportunity to reschedule a missed hearing be provided whenever a

claimant might "ultimately be located," as Plaintiff appears to argue it does.[4] Dkt. 18 at 6. The procedures followed here were sufficient. The A.L.J. did not err in finding constructive waiver. Due process was satisfied.

### B. Whether the A.L.J.'s Benefits Denial was Supported by Substantial Evidence

For purposes of this appeal, the Court focuses on whether Plaintiff was disabled between September 20, 2021 (the date of his application) and April 3, 2024 (the date of the A.L.J.'s decision). *See Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 999–1000 (9th Cir. 2015).

#### 1. The ALJ's Rejection of Dr. Reinking's Opinion

With respect to rejecting Dr. Reinking's opinion, which showed significant limitations of Plaintiff's ability to work, the A.L.J. explained as follows:

> The January 2024 opinion of Jason Reinking, M.D. . . . is not persuasive. The doctor opined that the claimant could not even perform full-time sedentary exertion, had no postural abilities, and had significant absenteeism and problems with concentration and pace. The limitations cited by the doctor are extreme and not supported given the claimant's lack of treatment and medications over the last several years and the minimal and unpersuasive treatment evidence in 2021. His limitations are inconsistent with his own examination findings in October 2021, which showed unremarkable abdominal, pulmonary, and neurological findings. . . . Despite his assertion of extremely limited walking and no postural abilities, the doctor's own examination found the claimant had normal gait and no problems moving his extremities. Furthermore, in this assessment, the doctor made no statement that he has treated the claimant in recent years.

A.R. at 23.

Prior to 2017, the Ninth Circuit employed a tiered set of reviewing standards according to which the opinions of treating physicians were afforded "substantial weight" and could only be rejected by A.L.J.s upon provision of "specific and legitimate reasons." *Woods v. Kijakazi*, 32 F.4th 785, 789–792 (9th Cir. 2022) (citations omitted). But under a new set of regulations enacted in 2017, this deference was eliminated. *Id.* at 792 (noting that the revised regulations "are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians"). The new regulations provide that irrespective of the authoring physician's

[4] Nor would such a requirement pass muster under *Matthews v. Eldridge*, given its consequent administrative burdens. *See* 424 U.S. 319, 331 (1976).

United States District Court
Northern District of California

relationship with the claimant, an A.L.J. is to evaluate the persuasiveness of medical opinions based on their: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors "that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c). Supportability and consistency are the most important factors. 20 C.F.R. § 404.1520c(b)(2). "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Woods*, 32 F.4th at 791–92 (quoting Section 404.1520c(c)(1)). "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Id.* at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)).

Even under these new regulations, the Ninth Circuit has noted, "an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Id.* "The agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings." *Id.* (internal citations and quotation marks omitted) (cleaned up).

Here, the A.L.J.'s explanation includes at least five reasons for rejecting Dr. Reinking's opinion as unpersuasive: (1) that the cited functional limitations are "extreme"; (2) that the cited functional limitations are unsupported in light of Plaintiff's "lack of treatment and medications over the last several years"; (3) that the cited functional limitations are unsupported in light of "the minimal and unpersuasive treatment evidence in 2021"; (4) that Dr. Reinking's "own [October 2021] examination found the claimant had normal gait and no problems moving his extremities"; and (5) that Dr. Reinking "made no statement that he has treated the claimant in recent years." A.R. at 23.

The first argument—that the allegations are "extreme"—is conclusory.

The second—pertaining to "lack of treatment"—is improper. It is well-settled that a claimant cannot be faulted for failing to seek medical treatment where the record shows they cannot afford it. *See Regennitter v. Comm'r of Soc. Sec.*, 166 F.3d 1294, 1299–1300 (9th Cir. 1999) ("[W]e have proscribed the rejection of a claimant's complaints for lack of treatment when

United States District Court
Northern District of California

the record establishes that the claimant could not afford it.") (citations omitted); *Gamble v. Chater*, 68 F.3d 319, 322 (9th Cir. 1995) ("It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.") (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984)). Here, Plaintiff is homeless, and it is reasonable to infer that his failure to obtain regular medical treatment stemmed from his indigence rather than from a lack of serious impairments.

The fourth argument—that a normal gait is inconsistent with Dr. Reinking's opinion—does not hold water. There is no reason why having a normal gait or use of one's extremities in a brief medical examination should be inconsistent with significant limitations on prolonged walking and postural activity when the person in question suffers from debilitating chronic pain.

The use of the word "unpersuasive" in the third argument is conclusory. And the remainder of the third argument (that there was minimal treatment evidence during the relevant period) and the fifth argument (that Dr. Reinking had not treated Plaintiff recently) go to the insufficiently developed state of the record, not the supportability or consistency of Dr. Reinking's medical opinion. Accordingly, such reasons indicate only that the record needs to be further developed, as the Court explores in more detail below, not that there is substantial evidence for the A.L.J.'s rejection of Dr. Reinking's medical opinion. *See* Section III(B)(3), *infra*.

**2. The A.L.J.'s R.F.C. Finding**

The A.L.J. is required to assess the claimant's residual functional capacity (R.F.C.) based on all of the relevant evidence. 20 C.F.R. §§ 416.927(b), 416.945. The A.L.J.'s findings may be set aside if not supported by substantial evidence. *McCartey*, 298 F.3d at 1075.

The A.L.J.'s explanation for his adverse R.F.C. finding resembles his rationale for rejecting Dr. Reinking's opinion. *See* Section III(B)(1), *supra*. To explain his R.F.C. determination, the A.L.J. wrote with respect to Plaintiff's underlying physical impairments:

> Imaging in 2018 and 2019 showed healing or healed fractures . . . . In December 2018, the claimant was diagnosed with chronic pain syndrome after reporting continuing pain in the neck, back, and ribs . . . . The claimant was observed with full range of motion in all joints and normal gait . . . . In June 2019, the claimant reported no assistive devices . . . . Since September 20, 2021, the protective filing date, the medical evidence does not suggest disabling pain. In October 2021,

United States District Court
Northern District of California

> the claimant's doctor observed that the claimant was not in acute distress, had normal gait, and was moving all extremities . . . . The doctor listed chronic pain syndrome as a diagnosis but indicated that it was not chronic . . . . The medical record shows no treatment for this condition, or any other condition, since 2021. In his July and November 2022 Social Security paperwork, the claimant denied receiving any treatment and denied any worsening of his conditions . . . . In 2022, he also denied taking any medications, including pain medications . . . .
>
> Regarding diaphragmatic hernia, the record shows the claimant suffered a traumatic abdomen stab injury in 2017 . . . . The claimant underwent diaphragmatic hernia repair in June 2019 . . . . On discharge, the claimant had stable vital signs, no gross laboratory abnormalities, was tolerating a regular diet, had achieved adequate pain control on medications, and was ambulating . . . . In April 2021, the claimant complained of shortness of breath and wondered if this was caused by a recurrent hernia . . . . The claimant again repeated this complaint in October 2021 but treatment notes show unremarkable abdominal, pulmonary, and neurological examinations . . . . A chest/abdomen CT was ordered but there is no indication in the record that these were actually performed . . . . The medical record shows no treatment for this condition, or any other condition, since 2021.

A.R. at 22.

With respect to the first quoted paragraph, the arguments boil down to (1) the presence of various purported signs of normalcy as of filing, (2) the paucity of post-filing treatment, and (3) the paucity of post-filing treatment evidence. The first of these arguments takes several different forms, and none supplies substantial evidence. To start, the fact that bones may have healed is no surprise, given that Plaintiff broke all but one of his ribs in the 2018 train crash. The healing of such bones does not negate subsequent symptoms documentation and diagnoses. *See, e.g.*, A.R. at 1883–87 (diagnosing chronic pain syndrome and other conditions in October 2021). Additionally, and as discussed above, the presence of a normal gait and use of one's extremities in a brief medical examination setting does not negate the functionally limiting effects of debilitating chronic pain. Indeed, the A.L.J.'s own citation to the presence of a normal gait when Plaintiff was diagnosed with chronic pain in 2018—within a year of his near-death train collision and contemporaneous with extensive documentation of severe impairment, *see* A.R. at 1922–25—refutes the idea that a normal gait in October 2021 would somehow be inconsistent with a finding of disability. Similarly, the lack of any evidence of symptoms "worsening" does not defeat functional limitation where those symptoms were significant to begin with, which the A.L.J. does

not rule out. Furthermore, the October 2021 medical note indicating that the chronic pain is not chronic—which was merely a one-word entry in an ostensibly required field of a structured data input chart, unaccompanied by explanation—does not constitute substantial evidence, as it is impossible to make sense of without more information. A.R. at 1883. Finally, to say that the October 2021 report is inconsistent with a finding of disability—when that report diagnoses chronic pain syndrome, diaphragmetic hernia, shortness of breath, and other conditions, and was issued within the relevant period—is unreasonable. The second argument—with respect to the paucity of post-filing treatment—and the third—with respect to the paucity of post-filing evidence—do not provide reason to reject Plaintiff's claim but rather speak to the need to develop the record further. *See* Section III(B)(3), *infra*.

With respect to the second quoted paragraph, similar defects defeat the A.L.J.'s findings. The idea that stable vital signs and lack of other abnormalities upon discharge from the hospital would contradict disability is revealed to be logically incoherent once one considers that stable vital signs and a lack of abnormalities are prerequisites for discharge from the hospital under any circumstances. But even putting aside this error, it is unreasonable to conclude that stable vital signs or lack of abnormalities at one point in time are inconsistent with disability where such point in time was at the conclusion of an eight-day long hospital stay consisting of multiple operations and initiated to treat "severe . . . abdominal pain associated with inability to tolerate [food.]" *See* A.R. at 460–62. Furthermore, the A.L.J.'s reliance on "unremarkable abdominal . . . examinations" at the 2021 doctors visit is unavailing. Notes from that visit state that Plaintiff cited "recurrent shortness of breath" as reason to think his diaphragmatic hernia "has recurred"; immediately after this note, Dr. Reinking indicated that he had ordered chest and abdomen C.T. scans. A.R. at 1885. The notes also indicate that Plaintiff only went to the doctor in the first place because of hernia-related pain. *Id.* at 1886 (noting "37 year old male here today for Follow Up (Hernia pain per patient . . .)"). Elsewhere in the notes, the following appears: "Abd: soft, nd,[5] nttp.[6] Left sided chest tube scar." *Id.* at 1887. Even to the extent that these jottings may properly

---

[5] "No deficit" or "non-distended."
[6] "No tenderness to percussion."

be considered "unremarkable abdominal . . . examinations," they do not tend to negate the functionally limiting impact of Plaintiff's diagnosed conditions, such as recurrent hernia and chronic pain, as such conditions would not be expected to produce, for example, distended skin. Other points raised by the A.L.J. with respect to diaphragmatic hernia merely go to an underdeveloped record. *See* Section III(B)(3), *infra*.

Plaintiff raises the additional point that the A.L.J. "makes no mention of the loss of [P]laintiff's eye and resultant monocular vision anywhere in his decision." Dkt. 18 at 15. The government responds that "the record contained no evidence that visual limitations functionally limited Plaintiff," and that in any event any error would have been harmless because none of the identified jobs have environmental restrictions. Dkt. 19 at 5. The core of the dispute with respect to monocular vision goes to a failure to fully develop the record. *See* Section III(B)(3), *infra*.

In the background of all of the reasons offered by the A.L.J. and by the Commissioner are two glaringly obvious sets of facts, both of which are clearly established by the Administrative Record: first, that in the 2017 to 2019 timeframe, Plaintiff suffered extreme physical trauma; and, second, that Plaintiff is indigent, homeless, and suffers from severe and chronic fentanyl use disorder. *See* A.R. at 1884. Furthermore, it strikes the Court as eminently plausible that Plaintiff's impairments stemming from the January 2017 eye impaling incident and the January 2018 train crash deepened or even precipitated his struggles with homelessness and addiction. *See, e.g.*, *id.* at 395 (noting in July 2018 that Plaintiff had only been "[h]omeless for the last year" and that "[p]rior to that he was paying rent"); *id.* at 396 (observing in the same doctors note that Plaintiff had been using heroin "to manage pain since he has been out of . . . medications [prescribed after the train crash]"). It seems no less plausible to the Court that Plaintiff's homelessness and addiction would hinder him from assembling a body of medical evidence adequate to prove whatever functional limitations he may have. Under such circumstances, denying benefits without further development of the record would risk perpetrating a form of injustice that Disability Insurance exists to prevent. *See Higbee v. Sullivan*, 975 F.2d 558, 562 (9th Cir. 1992) (justifying the reversal of a benefits reinstatement denial by noting that "it would be contrary to the purpose of the S.S.I. program to affirm the Secretary's decision as based on [Plaintiff-Appellant's] failure



United States District Court
Northern District of California

to cooperate, when the record suggests the failure may be due to the very mental illness that rendered [Plaintiff-Appellant] eligible for benefits"). The A.L.J.'s findings with respect to Plaintiff's R.F.C. are not supported by substantial evidence and must be set aside. *See McCartey*, 298 F.3d at 1075.[7]

**3. The A.L.J.'s Development of the Record**

Plaintiff argues that "[b]ecause the record was inadequate to establish [P]laintiff's current function-by-function capabilities, the ALJ had a duty to further develop the record." Dkt. 18 at 17. The government barely contests this contention, noting in a heading that "[t]he ALJ fulfilled his duty to develop the record" but otherwise stating merely that Plaintiff's argument with respect to such duty "largely restates his prior arguments." Dkt. 19 at 6.

It is well established that "the burden is on the claimant to establish [their] entitlement to disability insurance benefits." *Tidwell v. Apfel*, 161 F.3d 599 (9th Cir. 1998), *as amended* (Jan. 26, 1999) (citation omitted); *see Stevenson v. Colvin*, No. 2:15-CV-0463-CKD, 2015 WL 6502198, at *3 (E.D. Cal. Oct. 27, 2015). Yet it is also the case that:

> The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered. This duty extends to the represented as well as to the unrepresented claimant. . . . The ALJ's duty to develop the record fully is . . . heightened where the claimant may be mentally ill and thus unable to protect her own interests. Ambiguous evidence . . . triggers the ALJ's duty to conduct an appropriate inquiry. The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record.

*Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (internal citations and quotation marks

---

[7] The Commissioner contends that medical records from before the filing date "fail[] to advance [Plaintiff's] arguments" because such records fall "outside of the period under consideration." Dkt. 19 at 4. It is of course true that for purposes of this appeal, the Court focuses on whether Plaintiff was disabled between September 20, 2021, and April 3, 2024. *See* Section III(B), *supra*; *see also Rounds*, 807 F.3d at 999–1000. But needing to establish disability within that timeframe does not diminish the relevance of the pre-filing evidence to the extent that such pre-filing evidence is probative of the long-term effects of events like the 2018 train crash. Nor do such time-based evidentiary boundaries support an outright denial of benefits where, as here, the medical findings from within the 2021 to 2024 period are not inconsistent with functional limitations but merely insufficiently developed with respect to them. Indeed, the government's argument that the record in the post-filing period needs further development supports doing just that—further developing the record. *See* Section III(B)(3), *infra*.



United States District Court
Northern District of California

United States District Court
Northern District of California

omitted); *see also Higbee*, 975 F.2d at 561 ("We have long recognized that the ALJ is not a mere umpire at [a disability benefits] proceeding, but has an independent duty to fully develop the record[.]").

The instant record is consistent with a finding that Plaintiff's physical impairments impose functional limitations suggesting an entitlement to disability benefits. *See* Sections III(B)(1), III(B)(2), *supra*. The record is also sufficiently ambiguous and underdeveloped with respect to such a finding to trigger the A.L.J.'s independent duty to develop the record further using the tools provided by S.S.A.'s C.F.R. regulations. *See* Sections III(B)(1), III(B)(2), *supra*; *Tonapetyan*, 242 F.3d at 1150–51; 20 C.F.R. § 404.1520b(b). Here, the A.L.J. took some steps to develop the record, including taking testimony from a vocational expert and scheduling a supplemental hearing. *See* Section III(A), *supra*. But the A.L.J. nevertheless did not fulfill his duty, because he failed to adequately develop the record of medical evidence relevant to assessing Plaintiff's physical functional capacity. *See* Sections III(B)(1), III(B)(2), *supra*; *Stevenson v. Colvin*, No. 2:15-CV-0463-CKD, 2015 WL 6502198, at *5–*6 (E.D. Cal. Oct. 27, 2015) ("Given the dearth of medical evidence in the record indicating the degree to which plaintiff's spinal impairments impacted his physical functional capacity, the ALJ had a duty to further develop the record"). Accordingly, the A.L.J. committed prejudicial error that invalidates his R.F.C. findings and his rejection of Dr. Reinking's medical opinion. *See Tonapetyan*, 242 F.3d at 1150–51 (concluding that the A.L.J. failed to develop the record fully and fairly with respect to the plaintiff's possible impairment and remanding for further development of the record); *Stevenson*, 2015 WL 6502198, at *5–*6 (finding and remanding similarly). Such error requires that this matter be remanded for further proceedings. *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (noting that "when the record before the agency does not support the agency action . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation" (internal citation, quotation marks, and footnote omitted)).

The instant record was insufficiently developed with respect to Plaintiff's chronic pain syndrome, diaphragmatic hernia, monocular vision, and other physical impairments—including

those that formed the basis of Dr. Reinking's medical opinion.[8] On remand, the A.L.J. shall further develop the record with respect to such physical impairments and how such impairments impacted Plaintiff's functional capacity. The A.L.J. may take whatever steps he deems appropriate to fulfill this instruction, but he shall at least make his best efforts, in consultation with Plaintiff's counsel, to have a physician conduct a medical examination of Plaintiff whose results with respect to such impairments may be reasonably expected to meaningfully inform a determination as to Plaintiff's functional capacity. *See Stevenson*, 2015 WL 6502198, at *5 (ordering the A.L.J. to, among other steps, "schedule plaintiff for a further consultative psychological examination" (footnote omitted)).

## IV. CONCLUSION

For the reasons set forth above, this matter will be remanded under sentence four of Section 405(g)[9] for further development of the record and for further findings addressing the deficiencies noted above. Accordingly:

(1) Plaintiff's Brief (Dkt. 18) is GRANTED for purposes of further development of the record consistent with the Court's instructions, *see* Section III(B)(3), *supra*;

(2) the Commissioner's Brief (Dkt. 19) is DENIED; and,

(3) this matter is remanded for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: September 30, 2026

AJAY KRISHNAN
United States Magistrate Judge

[8] *See* A.R. at 1963 (justifying a finding of functional limitations by reference to "[s]evere physical trauma as hit by train 2018 with persistent chronic severe debilitating pain due to mix of lumbar fractures with resultant severe scoliosis, [history] of multiple rib fractures, history of clavicle fracture, and known hernia (diaphragmatic)").

[9] "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).